**A.R. SALES CO., INC., d/b/a A.R. Contracting Co., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 00–71C.

United States Court of Federal Claims.

Jan. 11, 2002.

Paul E. Loomie, New York City, for plaintiff.

James C. Caine, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With him on the briefs were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, and Donald E. Kinner, Assistant Director.

## OPINION

BRUGGINK, Judge.

This case involves a construction contract that was default terminated. In an earlier opinion, we addressed defendant's Motion for Summary Judgment and alternative Motion for Partial Summary Judgment. We granted defendant's motion to dismiss Count II. We denied defendant's motion for summary judgment (along with plaintiff's cross-motion) as to Count I, the only remaining count, and declined to rule on the motion for partial summary judgment. *AR Sales Co., Inc. v. United States,* 49 Fed.Cl. 621 (2001). Instead, we asked for supplemental briefing on two issues: (1) plaintiff's argument that it was unable to adequately respond to the Army's November 13, 1998 cure notice; and (2) the applicability and legal effect of Federal Acquisition Regulation ("FAR") 49.402–3.

The briefing is complete.[1] For the reasons set out below, defendant's Motion for Summary Judgment is granted.

## BACKGROUND

Most of the extensive background facts are set forth in the prior opinion. The additional facts were submitted by defendant in response to our order for supplemental briefing.

On October 14, 1998, plaintiff sent two letters to the Army. At that point, the completion date for the work was June 30, 1998, and the work was well behind schedule. The first letter complained of defective specifications and requested clarification regarding the contract's requirements in five areas: 1) downspouts, area drains, and sump pumps; 2) whether the concrete trough would require control joints or expansion joints; 3) the requirement for underground lines in the paths of trees or bushes; 4) whether asphalt restoration was still necessary; and 5) a request for written direction concerning point repairs. The second letter expressed confusion concerning two additional items: 6) the end date of the contract; and 7) the Army's failure to respond to plaintiff's July 23, 1998 letter listing possible contract additions and deletions. The second October 14 letter indicated that the Army, through its actions, was responsible for delaying the work by 140 days because it treated a sub-contractor as if it were the prime contractor.

In a response letter dated November 4, 1998, the Army addressed each of plaintiff's requests for clarification. The letter also directed plaintiff to submit a revised progress schedule and advised it that, when submitting the schedule, the starting date would be the "NTP date," December 19, 1997, and that plaintiff should reflect in the schedule the "no work" days in September and October 1998. Because of "confusion" about the completion date, the Army extended it to August 31, 1998.

In a cure notice dated November 13, 1998, the Army informed plaintiff that its contract would be terminated for default unless it corrected several conditions. These included plaintiff's asserted failures to: complete the contract work in a timely manner; submit a revised progress schedule; diligently prosecute work on the drainage trough; submit payroll reports; submit contractor quality control daily reports; and provide safe working conditions. The notice directed plaintiff to cure these deficiencies within ten days and provide it with a revised schedule reflecting completion of all phases of the work. On November 18 and again on November 25, plaintiff sent letters to the Army complaining of government-induced delays and wrongdoings concerning the contract and the progress of the work. These letters failed to provide the Army with any kind of progress schedule or projected completion date. Other facts relevant to the cure notice and the default termination are found in the earlier opinion.

## DISCUSSION

 In *Danzig v. AEC Corp.*, 224 F.3d 1333 (Fed.Cir.2000), the Federal Circuit held that, in the face of a validly issued cure notice, the contractor must give reasonable assurances that it will complete performance. In the absence of such assurances, default termination is proper. Defendant argues that plaintiff's performance up to November 13, 1998, supported the sending of the cure notice and that its failure to provide the Army with a revised progress schedule and completion date thereafter legitimated the termination for default.

Plaintiff asserted in prior briefing that it could not adequately respond because there were "outstanding issues that needed to be resolved by the government." *AR Sales*, 49 Fed.Cl. at 629. We initially denied defendant's motion for summary judgment because defendant did not address this defense. Defendant attempts to do so now in its supplemental brief.

In its motion for summary judgment, plaintiff asserted that it could not provide the revised progress schedule because the Army

1. Defendant filed a supplemental brief with appendix and new proposed findings of uncontro-

verted fact. Plaintiff elected not to respond.

never provided it with "written clarification of the actual scope of work, including proper contract change orders and modifications."[2] Pl. Mtn. for Summary Judgment at 25. These charges are presented in its October 14 letters requesting clarification regarding the contract's requirements in several areas.

The Army's response to those letters on November 4 was comprehensive. It was followed by the cure notice, which we find to have been reasonable under the circumstances. Plaintiff's opportunity to respond to both the Army's answers to plaintiff's purported confusion and to the cure notice was in its November 18 or November 25 letters. It did not do so. The first of these letters was a completely missed opportunity to respond point by point to the Army's answers or assertions. Although an attachment to the November 25 letter summarizes plaintiff's grievances with the Army's conduct of the contract, it does not directly respond to the cure notice, with one possible exception. That exception is as to the first of the seven issues plaintiff expressed confusion over in October: the lack of direction with respect to the downspouts, area drains, and sump pumps. In an attachment to its November 25 letter, plaintiff merely reiterates its purported confusion, however, but does not respond to the assertions in the Army's November 4 letter addressing this issue.

The second issue, relating to whether control joints or expansion joints would be required in the concrete trough, we also view as addressed in the Army's November 4 letter: "[t]he Government has not (WILL NOT?) recommend control joints for the drainage trough." This response informs plaintiff that, at that time, the Army did not intend to modify the contract to include expansion joints. Although the "(WILL NOT?)" language indicates some uncertainty, it cannot be interpreted as more than the Army's reservation of its right to make future changes in the specification if necessary. As defendant points out, neither plaintiff's November 18 letter nor its November 25

letter indicate any confusion concerning the trough.

The Army responded to plaintiff's third issue, the requirement for underground lines in the paths of trees or bushes, by stating that "actions required regarding small trees and bushes in the path of the new drainage trough should be discussed in the field between the AR Rep and COE Project Engineer. If a Differing Site Condition exists, a contract modification will be prepared." Neither of plaintiff's subsequent letters indicate any confusion over this response.

The Army addressed plaintiff's fourth issue, asphalt restoration, by stating that "all asphalt restoration to the service roads and loops required under your contract will be deleted from the contract, except for the repairs on Lee Road which remain the responsibility of AR." Again, plaintiff did not express any confusion over this response in its November 18 or November 25 letters.

The Army responded to plaintiff's fifth issue, concerning point repairs, by stating that "[p]ipe repair is addressed in Contract Specifications section 02767, paragraph 3.1.3." Neither of plaintiff's subsequent letters requested additional clarification of this statement.

In its November 4 letter, the Army eliminated any confusion about the sixth issue, the contract completion date, by moving it to August 31, 1998, the date suggested in one of plaintiff's October 14 letters.

The seventh issue concerns the Army's alleged failure to respond to plaintiff's July 23, 1998 letter proposing a list of contract additions and deletions. The letter states that, "[f]ollowing our discussion with Mr. Pavone we hereby, prepare a list of items that may be deducted/added to the contract . . . ." The list, for the most part, addresses several of the previous issues. In its November 4 letter, the Army responded to plaintiff as follows:

---

**2.** Plaintiff submitted "information" to the Army on September 15, 1998, including bar charts that apparently established a rough completion schedule for the concrete trough and the storm drain. Even if this submission could be con-

strued as a new schedule, it shows completion by mid-November for the trough and early October for the drain. Plainly, by November 13, this schedule was ineffective.

[t]he July 23, 1998, AR letter regarding additions/deletions to the contract was submitted at the request of the Government in order to clarify questions AR had about the project. The letter did not request direction from the Government. It was also understood by Mr. John Pavone, the Project Engineer, that these issues would be discussed in the field prior to a Government written response. However, AR never set up a meeting to discuss the issues.

Again, plaintiff's November 18 and 25 letters indicate no confusion as to this passage.

Plaintiff's November 18 and November 25 responses to the Army's Cure Notice thus contain no specific reasons for an inability to provide a revised schedule; instead, they consist of general complaints and allegations concerning the government delay and an undifferentiated rehash of the Army's asserted failure to adequately respond to plaintiff's questions and concerns.

Defendant likens these circumstances to those of *Danzig*. There, the Navy contracted with AEC Corporation to complete construction of a training center. 224 F.3d at 1334. AEC experienced delays in completing the work and the Navy issued a cure notice, to which AEC responded by submitting two progress schedules, neither of which it adhered to. *Id.* The Navy sent AEC a second cure notice, which AEC responded to by complaining of government-induced delays and problems with its finances and stating that it could give no assurance as to when the project would be completed. *Id.* at 1335. AEC subsequently failed to respond to a letter, issued by the Navy, to show cause why the contract should not be terminated for default. *Id.* The Navy then terminated the contract for default. *Id.* at 1336.

The Federal Circuit found that AEC's response to the cure notice "failed to provide the requisite assurances that [it] would complete the project on a timely basis." *Id.* at 1339. More specifically,

AEC's assertions of government-caused delay ... did not respond adequately to the Navy's request for assurances. Although AEC referred to government-

caused delays in both the April 3 and April 5 letters, it was not specific as to what changes had caused delay or how much delay it considered the government to have caused, nor did it represent that it could complete the contract within the additional time to which it believed it was entitled. *Id.* The Navy was entitled to regard AEC's failure to provide adequate assurances as a "breach of the contract justifying termination of the contract for default." *Id.* at 1340.

In this case, the contract completion date had lapsed by November 13, 1998, when the Army sent plaintiff the cure notice. Plaintiff's November 25 response neither referenced a progress schedule nor attempted to gather the information necessary to provide one. This utter failure to provide reasonable assurances in response to a well-justified cure notice suffices as a justification for the termination of the contract for default, particularly when plaintiff failed to timely respond to the show cause notice.[3]

Even if, in its November letters, plaintiff had justified 140 days of additional delay—a completely unwarranted assumption—project completion would have been approximately January 18, 1999 (measured from August 31). Yet, in none of its responses to the cure notice did AR Sales submit a revised schedule or commit itself to complete the work, even by January. That circumstance remained unchanged as of the date of the show cause notice, January 8, 1999, when the Army asserted, without subsequent denial by plaintiff, that plaintiff had not prosecuted work on the drainage trough and had failed to submit contractor control daily reports.

Application of FAR 49.402–3 does not alter the result. That provision states that "if the Government has taken any action that might be construed as a waiver of the contract delivery or performance date, the contracting officer shall send a notice to the contractor setting a new date for the contractor to make delivery or complete performance." 48 C.F.R. § 49.402–3(c) (1999). In this case, the contract's delivery date was August 31, 1998. The Army terminated the contract on *Febru-*

---

3. We reject the suggestion that plaintiff did not receive the notice to show cause. Plaintiff acknowledged receipt of the later termination notice, sent to the same address.

ary 4, 1999. The issue before us is whether, by not terminating the contract until February 1999, or by not establishing a new delivery schedule date, the Army waived the delivery schedule.

 Relying on *DeVito v. United States,* 188 Ct.Cl. 979, 413 F.2d 1147 (1969), defendant argues that there was no waiver.

In *DeVito,* the court held that

[t]he necessary elements of an election by the non-defaulting party to waive default in delivery under a contract are (1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent.

413 F.2d at 1154.

 According to defendant, the evidence fails to indicate that the Army delayed terminating under conditions indicating forbearance. Instead, defendant argues, the facts indicate that it was aggressively attempting to require plaintiff to provide a completion schedule in order to determine whether forbearance was appropriate. We agree.

On September 17, 1998, the Army held a meeting with plaintiff and expressed concern over plaintiff's progress. On September 28, it sent plaintiff a letter further expressing its concern that plaintiff had not developed a progress schedule. By letter dated October 19, the Army informed plaintiff that, due to its unsatisfactory progress, the Army was withholding an additional ten percent of all progress payments. The letter also informed plaintiff that a continued lack of progress could result in additional withholdings.

By letter dated October 27, 1998, the Army expressed concern that it had still not received a revised progress schedule. In its November 13, 1998, letter, the Army expressed concern that plaintiff had failed to perform since October 21. This letter made clear that plaintiff's lack of activity was en-

dangering its performance under the contract. The Army did not delay long after these events to send a cure notice (November 13), or a notice to show cause why the contract should not be terminated (January 8, 1999).

Plainly there was no reliance here on the Army's forbearance. The contractor has not alleged that it continued performance, much less that it attempted to accelerate performance. Plaintiff performed no work from October 22 to November 9, and, by November 13, the project was, according to defendant, only half complete.[4] We find that there was no waiver of the completion date or that the Army was obligated to reset the contract clock. Doing so would have been pointless under the circumstances.

## CONCLUSION

Defendant's motion for summary judgment as to Count I, the only remaining count, is granted. Accordingly, the Clerk is directed to dismiss the complaint with prejudice. Each side to bear its own costs. Judgment accordingly.

---

**4.** Defendant alleged this in its November 13 cure notice. Plaintiff did not dispute this in its No-

vember 18 or 25 letters.